*NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| AKOUAVI KAPADE AFOLABI, | : | |
| | : | Civil Action No. 13-3396 (JLL) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |

**LINARES**, District Judge:

Presently before the Court is the motion of Akouavi Kapade Afolabi ("Petitioner") to vacate, set aside, or correct her sentence brought pursuant to 28 U.S.C. § 2255, (ECF No. 1), on which this Court held an evidentiary hearing on November 4, 2015 (ECF no. 20-21). Petitioner has filed a post-hearing brief in support of her sole remaining claim (ECF No. 22), to which the Government has replied. (ECF No. 23). For the following reasons, the Court will deny Petitioner's motion to vacate and will deny Petitioner a certificate of appealability as to her sole remaining claim.

**I. BACKGROUND**

Because this Court summarized the basic factual background in its previous opinion disposing of all but one of Petitioner's claims (*see* ECF no. 9 at 1-4), this Court will only address those events which took place subsequent to that opinion here. On June 15, 2015, this Court entered an order and opinion which denied all of Petitioner's grounds for relief save one: her claim

that her trial counsel had been ineffective in failing to properly advise her regarding a plea agreement offered by the Government prior to trial. (ECF No. 9-10). As to Petitioner's plea agreement claim, this Court ordered, and ultimately conducted, an evidentiary hearing, which was held on November 4, 2015. (*Id.*; ECF No. 20-21).

At the hearing, Petitioner testified on her own behalf through the aid of two Ewe interpreters. (Hearing Transcript, ECF No. 21 at 7-8). Petitioner testified that, after being charged in her criminal case, Olubukola Adetula was appointed as her defense counsel. (*Id.* at 8-9). Petitioner further confirmed that Adetula remained her attorney throughout her trial and direct appeal. (*Id.* at 9). Petitioner testified that, upon first meeting her, Adetula attempted to speak with her in Yoruba, a language which Petitioner does not speak. (*Id.* at 10). Petitioner alleged that she and Adetula had difficulty communicating as a result of the fact that she spoke Ewe and Ashanti and he did not. (*Id.*). Petitioner testified that although Adetula visited her several times, he did not find an interpreter until several of these meetings had taken place. (*Id.* at 10-12). Although Petitioner stated that she had a language barrier and could not understand this Court at her first appearance, Petitioner admitted that there was an interpreter present for her remaining court hearings. (*Id.*). Petitioner testified that Adetula ultimately found an interpreter who spoke a sister language to Ewe, which she could understand. (*Id.* at 13). Petitioner stated that it was after this interpreter was found that she truly began to communicate with counsel, and Adetula explained to her the charges she faced, although Petitioner alleged that counsel never explained to her the amount of jail time she faced on her charges.[1] (*Id.* at 14).

---

[1] Although Petitioner testified that she didn't understand counsel without the interpreter, she also stated that counsel often came to her without the translator even after this point. (*Id.* at 24-25).

2

Petitioner further testified that, at about this time, she also began to interact with another prisoner named Victoria. (*Id.* at 14-15). According to Petitioner, although Victoria initially had another attorney, Victoria ultimately became a client of Adetula as well. (*Id.*). Petitioner testified that she discussed Victoria's case with her. (*Id.* at 17-18). Petitioner stated that Victoria ultimately pled guilty to her charges, and that, after hearing about how a guilty plea helped Victoria, she told Adetula that she wished to "sign that paper" like Victoria did, although she did not know the formal term for pleading guilty. (*Id.* at 17). Petitioner also asserted that she had Victoria call Adetula on her behalf and tell him in Yoruba to arrange for Petitioner to "sign" a deal as Victoria had done. (*Id.* at 18). Petitioner further testified that, in 2009, she again asked to sign an agreement like the one Victoria signed after she received a letter from her son encouraging her to plead guilty. (*Id.* at 19-20). Petitioner testified that, in response, Adetula told her to let him do his job. (*Id.* at 21). Petitioner further asserted that Adetula did not explain to her her potential sentencing exposure, nor the differences between the American and African justice systems. (*Id.* at 21-22). Petitioner also claimed that she had another inmate named Gifty call Adetula and ask him to help Petitioner sign an agreement like Victoria's after Gifty was released from jail. (*Id.*).

When confronted with the plea deal which was offered in this case, Petitioner stated that she had never been shown the deal before by Adetula. (*Id.* at 24). Petitioner claimed counsel never explained the deal to her, never translated it for her, and failed to explain the comparative sentencing exposure she would face under the deal as opposed to at trial. (*Id.* at 24-25). Petitioner claimed that she never raised her frustrations with the Court regarding Adetula's inability to secure a deal for her because she trusted that he would help her.

On cross-examination, Petitioner testified that she had been coming to this Country from

3

Africa since 1996. (*Id.* at 32). Petitioner further claimed on cross-examination that although she had been provided with an interpreter at trial, and although she never claimed that she had difficulties in understanding proceedings, that she had been confused by the trial, and at that time did not understand proceedings as well as she currently did. (*Id.* at 32-34). When confronted with her claim in her § 2255 motion that counsel had failed to "seek a favorable plea deal", Petitioner stated that "what [she] wanted to sign was . . . never presented [to her]." (*Id.* at 34). On re-direct, Petitioner clarified that the deal which Victoria received included a sentence of "only about a year or so" and that what she wanted was for counsel to get a lesser sentence for her. (*Id.* at 35-36).

Mr. Adetula also testified at the evidentiary hearing. Adetula testified that he had been a lawyer for nearly twenty-nine years, and that he has done exclusively criminal defense for the last ten to twelve years. (*Id.* at 37-38). Adetula testified that his general practice is to get to know clients as soon as he is hired or assigned, and to obtain an interpreter immediately if he cannot communicate with a client. (*Id.* at 38-39). He further testified that upon meeting a client, he explains how the system works, the charges that the client faces, and will eventually discuss the plea bargaining process and give brief details about trial in an initial meeting with a client. (*Id.* at 42). Adetula also stated that he explains the plea bargaining process in detail, including as to the differences in punishment that often result, the stipulations that generally are involved, and regarding what is involved in a plea hearing. (*Id.* at 42-44). Adetula then testified that this discussion includes a discussion of the United States Sentencing Guidelines and their effects on sentencing in the federal system. (*Id.* at 44). Adetula also testified that, when offered a plea agreement, he provides the agreement to the client, allows them to review it, and thoroughly

4

explains the agreement to his clients. (*Id.* at 45-46). Adetula clarified that part of any such discussion would be an explanation of sentencing exposure under the agreement and if the client decided to proceed to trial. (*Id.*).

Turning to his representation of Petitioner, Adetula explained that he had been able to communicate with her without the aid of an interpreter. Specifically, Adetula stated that

> The only language I have in common [with Petitioner] is English. When I say the only language is English, there is a slight variation of English that is referred to as broken English, and that's – it is a[n] offshoot of your plain English language.
>
> It is very common now with a number of West African countries, including Nigeria and the Republic of Benin, Ghana, Togo. Sometimes we find comfort in using the broken English. It is something that you tend to use very commonly when you have some familiarity with the person you are speaking to instead of a formal . . . language.
>
> [Counsel then asked whether broken English was simply grammatically incorrect English].
>
> It is the same English. It just has – you know, there's some words that over time you just – you switch them around, and I don't know how to explain it. But you know, she and I spoke in English, and of course, there were times we also spoke broken English.
>
> The only other language I speak is Yoruba, and she does not speak Yoruba, as far as I know. I have never spoken to her in Yoruba.
>
> I will say that I think the very first day I met her, I may have extended pleasantries in Yoruba, and then realized that she didn't speak Yoruba, and there is a reason for that.
>
> The name Afolabi is a Yoruba name. It's not a name from Togo or Ghana or any of the African countries. It is a Yoruba name. It is a Nigerian name, and my recollection is that her husband's mother I think was from Nigeria, was from the Yoruba tribe in Nigeria. That's [why] her husband had the name Afolabi.

5

> So of course, I recognized that immediately, and I may have extended pleasantries in Yoruba to her at the onset. But beyond that, as far as I know, she doesn't speak Yoruba, and I have never spoken Yoruba to her.

(*Id.* at 47-49).

Adetula testified that he did eventually hire an interpreter for meetings with Petitioner, but that he did not do so for his own benefit. (*Id.* at 49). Adetula testified that, during the course of his representation of Petitioner, he came to believe that there may have been cultural issues he did not understand, and therefore hired a cultural expert to help him deal with petitioner's case. (*Id.*) Adetual further stated that it was the expert, and not counsel, who required the interpreter and insisted that one be on hand before he would meet with Petitioner. (*Id.* at 49-51).

Essentially, Adetula testified that the expert was necessary to help him deal with one of the central problems he faced with Petitioner's case – that Petitioner did not understand how her behavior was wrong. (*Id.* at 50-51). Adetula testified that Petitioner did not understand why her actions were criminal because they were apparently common place in her home country, and were considered acceptable in her culture. (*Id.*). Thus, Adetula hired the expert to help him explain to her that, even if her actions would have been permissible in West Africa, they were considered criminal conduct in this country and would warrant a considerable sentence under American law. (*Id.* at 51-52).

Adetula also explained that this issue, Petitioner's belief that she had not done anything wrong but instead had acted as a Good Samaritan for the girls she had brought to this country, proved a stumbling block in his attempt to get her to accept a plea deal. (*Id.* at 53). Adetula testified that Petitioner's was a rare case where he had been able to keep the plea deal offered by

6

the Government open for a considerable period of time while he tried to convince Petitioner of the merit of pleading guilty. (*Id.*). Adetula further testified that, despite his best efforts and explanation that she would receive a sentence of only 12-13 years under the agreement, Petitioner had never reached a point where she was willing to admit that her conduct had been sufficiently criminal to warrant the level of sentence called for in the Government's plea offer. (*Id.* at 53-54). Although Adetula thought that Petitioner probably would have plead guilty if the Government had offered a "significantly lower" sentence, he had been unable to get her to accept the deal that had been offered after many discussions of the deal. (*Id.* at 54-55). Ultimately, Adetula believed that "that plea of 12 to 13 years, coupled with having to publicly acknowledge that she had been involved in criminal activities just made it impossible to get [Petitioner] to accept the plea, [despite the fact that counsel] continued trying to persuade her even through . . . as late as . . . July, August 2009." (*Id.* at 55).

Counsel provided the following testimony regarding his efforts to explain the deal to Petitioner:

> I remember that I had gotten the plea agreement from the U.S. Attorney's Office I want to say maybe a week or two . . . after it was sent to me. Maybe a week later I went to see her.
>
> I spent a lengthy period of time with her. I explained all aspects of it to her. I took my time. I conversed with her about it.
>
> She explained that she understood all aspects of it, but continued to insist that why should she plead guilty if she did not do wrong, and I couldn't get past that with her.

(*Id.* at 55-56). Adetula stated that although he explained to her the "pros and cons of pleading guilty," Petitioner "was like a broken record" and he "could not get her past the fact that she

7

[believed that] she did not do anything wrong." (*Id.* at 58). Counsel likewise testified that he had never felt that they had any issues communicating during this time, and that he often spent hours speaking with her, and not only about her case but about other issues as well. (*Id.* at 56-57).

When asked by this Court about Victoria and Gifty contacting him on Petitioner's behalf, Adetula stated that he had represented a Victoria, who had pled guilty and received a lower sentence because of a motion for a downward departure Adetula filed on her behalf in a drug related case. (*Id.* at 59). Adetula testified, however, that he did not remember speaking with Victoria about Petitioner's case, and that although Victoria may once have asked him to do his best for Petitioner, he did not recall discussing, and by general practice would not have discussed, Petitioner's case with Victoria. (*Id.* at 59-60).

As to Petitioner's statement that she had asked Adetula to do the same thing for her that he had done for Victoria, Adetula explained that Petitioner had told him that she "wanted [him] to find a way to get her to go home immediately. She was prepared at that point to give up her green card . . . . [a]nd she discussed with me finding a way to get a deal for her and giver the opportunity to go home right away and not spend time in prison." (*Id.* at 60). Thus, counsel explained that by doing the same for her as for Victoria, Petitioner had wanted a deal where she could have returned home immediately, similar to the result Adetula had procured for Victoria, and that Petitioner was not willing to take the deal that had been offered. (*Id.* at 61-62).

Following the hearing, Petitioner submitted a post-hearing brief in support of her § 2255 motion on November 23, 2015. (ECF No. 22). The Government filed a response thereto on December 7, 2015. (ECF No. 23).

## II. DISCUSSION

### A. Legal Standard

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence. Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255. Unless the moving party claims a jurisdictional defect or a Constitutional violation, in order to merit relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, (or) an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir.) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

9

**B. Analysis**

**1. Credibility Determinations**

After having considered the testimony of the witnesses at the evidentiary hearing held in this matter, and having observed the manner of the witnesses, this Court makes the following credibility determinations. This Court finds that the testimony of Petitioner's trial counsel, Mr. Adetula, was very credible. This Court specifically found credible counsel's assertions that he had been able to communicate with Petitioner through English and broken English, that he had communicated the plea deal to Petitioner, and Petitioner refused to accept the deal that was offered. In so doing, this Court notes that counsel's testimony aligns with the defense raised by Petitioner at trial, and his claim that Petitioner refused to admit the criminal nature of her actions is bolstered by the fact that Petitioner attempted to raise at sentencing an argument that her sentence should be reduced because of the "good" she had done for the young women she brought into this country. Adetula's credibility is further bolstered by Petitioner's own testimony that she didn't receive a deal that was like the one Victoria received and that counsel failed to negotiate for a better or adequate plea deal. Adetula's testimony regarding his many years of experience, and as to his common practice provides a further basis for finding his testimony – that his actions with Petitioner matched his habitual practices after nearly thirty years of legal practice – credible.

This Court finds less credible Petitioner's assertion that she and counsel did not understand one another. Not only did Petitioner's testimony run contrary to counsel's credible testimony, but it also seems to run counter to itself in so much as Petitioner testified that counsel frequently visited her, even without an interpreter. Petitioner's testimony is also undercut by the fact that she never complained to this Court or on appeal about an inability to understand counsel, and elected to keep

10

Mr. Adetula as her lawyer through the course of her direct appeal. Based on the content of her testimony, and Petitioner's mannerisms and demeanor during her testimony, this Court finds that Petitioner's testimony was far less credible than that of counsel, and thus to the extent that their testimony conflicts, this Court has determined that Mr. Adetula's testimony should be credited over that of Petitioner.

### 2. Petitioner did not receive ineffective assistance at the plea bargaining stage

The sole remaining claim before this Court is Petitioner's assertion that Mr. Adetula failed to provide her with adequate advice during the plea bargaining stage of her criminal matter resulting in her rejecting a favorable plea deal and proceeding to trial, where she received a harsher sentence.[2] Petitioner asserts both that counsel failed to provide her with the plea deal offered by the Government after she requested that he help her plead guilty, and that counsel failed to properly advise her of the potential sentencing exposure she was facing by pleading guilty. The Third Circuit recently provided the following direction in dealing with claims of ineffective assistance of counsel in relation to a plea offer:

> In *Strickland v. Washington*, [466 U.S. 668] (1984), the

---

[2] As this Court noted in its previous opinion, "[t]o the extent that Petitioner wished to raise a claim that counsel did not negotiate for a more favorable plea offer than the one provided by the Government, this Court notes that a criminal defendant has 'no right to be offered a plea . . . nor a federal right that the judge accept it.' *Lafler v. Cooper*, --- U.S. ---, ---, 132 S. Ct. 1376, 1388 (2012). Without some evidence that the Government did or would have offered a more 'favorable' plea offer, which Petitioner does not even assert, let alone show, Petitioner cannot established that she was prejudice by counsel's alleged "failure" to secure such a deal. *See, e.g., Missouri v. Frye*, --- U.S. ---, ---, 132 S. Ct. 1399, 1409 (2012). Any such claim by Petitioner would therefore fail, and relief is denied as to Petitioner's claim that counsel did not obtain a better deal for her." (ECF No. 9 at 9 n. 3). Thus, only Petitioner's claim that she was not provided proper advice as to the plea deal that *was* offered remains before this Court.

11

> Supreme Court established a two-part test to evaluate ineffective assistance of counsel claims. The first part of the *Strickland* test requires "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687[] (internal citations omitted). The second part specifies that the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694[.] We have reasoned that "there can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument." *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir.1999).
>
> . . . The Court has re-emphasized that "[d]efendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." *Lafler v. Cooper*, [132 S.Ct. at 1384].
>
> When addressing a guilty plea, counsel is required to give a defendant enough information "'to make a reasonably informed decision whether to accept a plea offer.'" *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir.2013) (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir.1992)), *cert. denied*, —— U.S. ——, [134 S.Ct. 1340] (2014). We have identified potential sentencing exposure as an important factor in the decision making process, stating that "[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *Day*, 969 F.2d at 43. In order to provide this necessary advice, counsel is required "to know the Guidelines and the relevant Circuit precedent...." *United States v. Smack*, 347 F.3d 533, 538 (3d Cir.2003).

*United States v. Bui*, 795 F.3d 363, 366-67 (3d Cir. 2015).

As this Court explained in its previous opinion,

> Where a petitioner shows that counsel's actions fell below an objective standard of reasonableness in either advising petitioner as to a potential plea, or in rejecting a plea Petitioner otherwise would have accepted, *see, e.g., Frye*, 132 S. Ct. at 1409, the petitioner must still show that this failure prejudiced the petitioner. *Lafler*, 132 S. Ct. at 1384-85. This requires Petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors,

12

>the result of the proceeding would have been different . . . [which i]n the context of pleas [requires] a [petitioner] show the outcome of the plea process would have been different with competent advice." *Id.* at 1384. Thus, a petitioner claiming that counsel's deficient actions led to the loss of the opportunity to plead pursuant to a plea bargain must show that the offer would have been accepted by the petitioner, the prosecution would not have withdrawn the offer, the court would have accepted its terms, and either the conviction or sentence under the offer's terms would have been less severe than that imposed after trial. *Id.* at 1385.

(ECF No. 9 at 11).

Having considered the testimony offered at the evidentiary hearing, it is clear that Petitioner has failed to show that she suffered ineffective assistance of counsel as, given this Court's credibility findings, it is clear both that Mr. Adetula was not constitutionally deficient, and Petitioner suffered no prejudice as a result of his advice. Turning first to counsel's representation, Mr. Adetula's testimony, which this Court credits, clearly establishes that he and Petitioner clearly understood one another, that he fully explained the Government's plea offer to Petitioner, and that he advised her that it would be in her best interests to accept the plea which was offered. Mr. Adetula's testimony also indicates that counsel explained the potential sentencing exposure Petitioner faced, and that, based on the significantly greater jail time Petitioner faced if she were convicted at trial, recommended the Government's plea offer. The testimony provided at the evidentiary hearing therefore suggests that counsel provided adequate advice regarding the plea agreement on offer, including as to potential sentencing exposure under the Guidelines, and that the only reason Petitioner did not accept the Government's plea agreement is because she had no interest in accepting the deal which was on offer. It is clear from the testimony this Court heard that Petitioner continued to have difficulty accepting the criminality of her conduct, and that the

13

only type of deal in which Petitioner would have been interested would have been one like the one Victoria apparently received – a plea offer involving little to no jail time and Petitioner returning home to Africa forthwith. As Petitioner is not entitled to a better plea than the one she was offered, *see Frye*, 132 S. Ct. at 1409, and Petitioner's unwillingness to accept the plea deal that was offered, rather than any deficiency on counsel's part, was responsible for Petitioner's rejection of the Government's plea offer, it is clear that Petitioner did not receive inadequate advice.

That Petitioner was unwilling to accept the plea which was offered also conclusively demonstrates that Petitioner was not prejudiced as a result of counsel's representation. Although the sentence Petitioner received after trial was more severe than that called for in the offered plea agreement, that Petitioner had no interest in accepting the offered plea is clear from Mr. Adetula's credible testimony. Petitioner was only interested in a deal which provided for significantly less time than the time called for in the offered plea agreement, and nothing in the record suggests that the Government ever considered offering Petitioner a more favorable plea arrangement than the one she rejected. Because it is clear from counsel's testimony that Petitioner had no intention of accepting the plea agreement which was offered by the Government, Petitioner is incapable of showing that she was prejudiced by counsel's advice in regards to the plea. *Lafler*, 132 S. Ct. at 1384-85. As Petitioner has shown neither that she received constitutionally deficient advice, nor that she was prejudiced, Petitioner has failed to establish a colorable claim of ineffective assistance of counsel, and her § 2255 motion must therefore be denied.

### III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a

proceeding under § 2255 unless she has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Based on this Court's credibility findings following an evidentiary hearing, it is clear that Petitioner's claim that she would have pled guilty absent counsel's ineffective assistance is without merit, that jurists of reason would not disagree with this Court's resolution of Petitioner's motion. As such, Petitioner's motion clearly does not deserve encouragement to proceed further, and this Court will deny Petitioner a certificate of appealability.

## IV. CONCLUSION

For the reasons stated above, Petitioner's motion to vacate her sentence is DENIED, and Petitioner is DENIED a certificate of appealability. An appropriate order follows.

Hon. Jose L. Linares,
United States District Judge